IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| CARNIVAL CORPORATION, a Panamanian corporation, <br><br> Plaintiff, <br><br> v. <br><br> DECURTIS CORPORATION, a Florida corporation, and DECURTIS LLC, a Delaware limited liability company <br><br> Defendants. | Case No: <br><br> **COMPLAINT FOR (1) BREACH OF CONTRACT, (2) VIOLATIONS OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1832 *et seq.*; (3) VIOLATIONS OF THE FLORIDA UNIFORM TRADE SECRETS ACT, Fla. Stat. §§ 688.001 *et seq.*; AND (4) PATENT INFRINGEMENT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Carnival Corporation ("Carnival") hereby brings this Complaint against Defendants DeCurtis Corporation and DeCurtis LLC (collectively "DeCurtis") and alleges on personal knowledge as to all matters relating to Carnival and on information and belief as to all other matters, as follows:

## PRELIMINARY STATEMNT

1.      Carnival is the world's largest and leading cruise vacation company.  It also is the creator and owner of a ground-breaking technology platform known as the One Cruise Experience Access Network®, also referred to as the O.C.E.A.N.™ or OCEAN® Platform, which combines a first-of-its-kind wearable device (OceanMedallion™ or Medallion®) with a network of servers, sensors, readers, and software to deliver unparalleled guest engagement and personal service to guests on Carnival's MedallionClass™ ships.  The OCEAN® Platform is the result of Carnival's years of hard work and substantial investment, including efforts by hundreds of Carnival employees and scores of third-party contractors.  The OCEAN® Platform is transforming the cruise industry, and competitors are scrambling to catch up.

2.      Defendant DeCurtis Corporation is a Carnival contractor that assisted with rapid prototyping work related to the OCEAN® Platform.  At the outset of that work, DeCurtis signed an agreement, referred to as the Master Services Agreement ("MSA"), that acknowledged Carnival's ownership of the technology under development and agreed to maintain in confidence the extensive confidential information and trade secrets to which DeCurtis was given access.  The MSA further prohibited DeCurtis from disclosing or using any written material, work product, or discoveries resulting from work under the MSA in connection with any presentations or work for other customers or prospective customers.

3.      Carnival recently discovered that DeCurtis has been making presentations to and working with Carnival competitors to develop technology platforms that copy the OCEAN® Platform and otherwise misappropriate and infringe Carnival intellectual property.  In response, Carnival exercised its contractual right to audit DeCurtis' compliance with the MSA and its obligations thereunder.  In breach of the MSA, DeCurtis refused to comply with its audit obligations, and it further admitted in writing that an audit of its records of work performed under the MSA would necessarily also disclose confidential information of third-party competitors of Carnival.  This admission by DeCurtis that work product prepared under the MSA had been used for and comingled with third-party work product not only confirmed DeCurtis' breach of contract but also provides additional evidence of DeCurtis' misappropriation of Carnival trade secrets and infringement of Carnival patents.

4.      Particularly in light of the challenging circumstances currently confronting the cruise industry, Carnival hoped to persuade DeCurtis voluntarily to comply with the MSA and to remedy its misappropriation and infringement of Carnival intellectual property.  But DeCurtis charted a different course.  On April 8, 2020, DeCurtis without warning filed a civil action in the United

States District Court for the Middle District of Florida challenging the enforceability of Carnival's patents and raising other meritless claims.  DeCurtis filed that action notwithstanding that the MSA expressly requires disputes between the parties to be resolved in this Court.  Carnival accordingly was left no choice but to initiate this action to seek justice by putting an end to DeCurtis' contractual breaches and other unlawful conduct.

5.     This Complaint asserts claims for breach of contract, trade secret misappropriation in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, *et seq*. (the "DTSA") and the Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.001 *et seq*.; and patent infringement.  Carnival hereby seeks preliminary and permanent injunctive relief, monetary damages, attorneys' fees and costs, an accounting, and such other relief as the Court may deem necessary and proper to redress the injuries caused by DeCurtis' unlawful conduct.

## **PARTIES**

6.     Plaintiff Carnival is a corporation organized and existing under the laws of the Panama, with its U.S. principal place of business in Miami, Florida.

7.     Carnival is a world leader in leisure travel, with nine leading brands that offer a wide range of vacation experiences tailored to deliver outstanding value to guests with diverse backgrounds and travel preferences.  Carnival is best known for being the world's leading cruise line company.  Founded in 1972 with just a single ship, Carnival's portfolio of global cruise line brands now includes Carnival Cruise Line, Holland America Line, Princess Cruises and Seabourn in North America.  Together, Carnival's cruise line brands comprise the world's largest cruise company with a fleet of 105 ships visiting more than 700 ports around the world. Carnival Corporation employs over 120,000 people worldwide and serves 11.5 million guests annually.

8.      Defendant DeCurtis Corporation is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Orlando, Florida.  DeCurtis' website bills the corporation as a "leader in transformational experience technology focused on cruise."   Defendant DeCurtis LLC is a Delaware limited liability corporation headquartered in Orlando, Florida. DeCurtis LLC designs, develops, engineers, manufactures, markets, and sells systems and methods for providing guests' engagement with cruise ship facilities through the use of wireless sensing technologies.

9.      Formed in April 2019, DeCurtis LLC is a continuation or reincarnation of the DeCurtis Corporation under a different name.  Alternatively, DeCurtis LLC is a mere instrumentality or alter ego of the DeCurtis Corporation, and DeCurtis LLC is dominated and controlled by DeCurtis Corporation to such an extent that the DeCurtis LLC has no separate existence.  DeCurtis LLC describes its business in the same exact manner as DeCurtis Corporation, has the same physical address as DeCurtis Corporation, is comprised of the same employees as DeCurtis corporation, has the same website and advertising as DeCurtis Corporation, and claims ownership of the same property as DeCurtis Corporation.

## <u>JURISDICTION AND VENUE</u>

10.      The Court has federal-question subject matter jurisdiction over Carnival's trade secret misappropriation claim arising under the DTSA pursuant to 28 U.S.C. § 1331 (federal question). The Court has federal-question subject matter jurisdiction over Carnival's patent infringement claims arising under the patent laws of the United States pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338 (patents)

11.      The Court has supplemental jurisdiction over Carnival's breach of contract and other state law claims under 28 U.S.C. § 1367 because those claims form part of the same case or

controversy under Article III of the United States Constitution and are based on the same underlying nucleus of fact.

12.     This Court has both general and specific personal jurisdiction over DeCurtis because its principal place of business lies within the State of Florida, because it has conducted and does conduct business within the State of Florida and this judicial district, and because it carried out a substantial portion of the wrongful conduct at issue, and caused injury, within the State of Florida and this judicial district.

13.     Venue in this district is appropriate under 28 U.S.C. §§ 1391(b), (c), and (d) and 1400.  Defendant resides in the State of Florida and this judicial district, because a substantial part of the events giving rise to the dispute occurred within this district, and because DeCurtis has committed acts of infringement and has a regular and established place of business in this district. For example, in a 2019 press release DeCurtis stated that it had an "office and presence" in Miami, Florida.

14.     The parties' written MSA further provides that the exclusive jurisdiction for litigation of any dispute, controversy or claim arising out of or in connection with the MSA or the breach thereof shall be litigated by the parties and/or their successors in the Federal or State court with competent jurisdiction located in Miami-Dade County, Florida.  The causes of action asserted in this Complaint arise out of and are in connection with the MSA and DeCurtis's breach thereof. Accordingly, this Court is the appropriate forum for litigating this dispute as well as all other disputes between the parties arising out of work done under the MSA.

## FACTUAL ALLEGATIONS

### Carnival's Breakthrough Technology in Guest Experience:  the OCEAN® Platform

15.     Carnival's unparalleled success in the cruise and leisure travel industry is due in significant part to innovation.  This began years ago with Carnival's first cruise ship, a converted ocean liner which featured a number of innovative elements along with a festive onboard ambiance unlike any other cruise ship sailing at the time.  Since then, Carnival has remained the leader in the field, consistently rethinking the cruise experience and delivering new, exciting technologies and other features for its guests.

16.     Carnival was the first in the cruise industry to have a vision for how new technology centered around wearable devices could revolutionize leisure travel by delivering personalized experiences.  And Carnival was the first to design, development, and implement that vision.

17.     In June 2014, Carnival began a development project, which was given the internal name "Project Trident," with a goal to create technology that would enable an entirely new level of service and personalized attention in leisure travel through a proprietary guest interaction and connection ecosystem.  This proprietary guest interaction system comprises a connected "experience platform" that combines a guest wearable device with a cross-platform Guest and Crew digital interaction tool to enable guest identification, commerce, payments, communications and navigation capabilities.  Carnival understood that such a proprietary guest interaction system would give Carnival a considerable competitive advantage.

18.     Project Trident was an enormous undertaking.  Carnival employees from a host of disciplines, including business strategy, operations, information technology, finance, guest services, marketing & sales, and ship design & engineering, were engaged in the innovation process at every stage of Project Trident.  The core Project Trident team was comprised of a cross-functional blend

of experts in experience design, show quality, brand development, creative design, digital interactivity, engineering, ecosystems, platform creation, and experience activation and integration. This core team included highly specialized, individually selected Carnival employees with deep experience in the holistic experience innovation space.  Many of these employees were hired by Carnival specifically to work on Project Trident.

19.     In addition to devoting extensive human capital to Project Trident, Carnival also invested substantial financial resources in the Project.  Carnival built out a dedicated 12,000 square foot facility, dubbed the Carnival Experience Innovation Center ("XIC"), to enable multi-disciplinary collaboration in an organic environment dedicated to Project Trident.  To maintain secrecy and security, Carnival housed its XIC in a highly secure location.  The XIC was, and remains, protected by robust physical and electronic security.  Access to the facility was, and remains, tightly restricted.

20.     Carnival has invested hundreds of million dollars in Project Trident development efforts.  That figure does not include the substantial additional sums required to outfit Carnival's ships with hardware components required to implement the resulting OCEAN® Platform on each MedallionClass™ ship, which include thousands of sensors connected by approximately 72 miles of cable throughout the ships' many decks, as well as approximately 4,000 interactive digital portals supported by multiple cloud-based datacenters.

21.     In investing heavily in Project Trident, Carnival was not following an obvious or predictable path. Project Trident reflected Carnival's commitment to remaining the leader in cruise vacation innovation by taking calculated risks in developing pioneering new technologies. The OCEAN® Platform was the first of its kind in the industry and Carnival's efforts were met with skepticism from some in the industry and related fields.

22.     Carnival's willingness to invest heavily in its vision and to undertake risks to remain a technology leader has paid off.  As alleged further below, Carnival has successfully implemented the OCEAN® Platform, garnering widespread acclaim, delighting millions of customers, and providing Carnival with a competitive advantage.

**DeCurtis Becomes a Contractor Subject to the Parties' MSA**

23.     In addition to Carnival's own employees and resources, Project Trident required Carnival to engage outside contractors to perform defined tasks to assist in implementing Carnival's vision.  DeCurtis was one such contractor.  Carnival engaged DeCurtis to assist in the critical rapid prototyping phase of Project Trident.

24.     On July 1, 2014, Carnival and DeCurtis executed a non-disclosure agreement ("NDA") to allow the parties to discuss entering into a business relationship.  Carnival and DeCurtis subsequently entered into a Master Services Agreement ("MSA") on July 24, 2014.  The MSA superseded the NDA and remains in force today.

25.     Carnival engaged DeCurtis in reliance on DeCurtis' promise to maintain the secrecy of both confidential information provided by Carnival and work product created by DeCurtis for Carnival (collectively referred to in the MSA as "Carnival Information").  To that end, the MSA imposed on DeCurtis strict confidentiality obligations with respect to all Project Trident information provided by Carnival to DeCurtis.

26.     Among other restrictions, the MSA provides that (i) DeCurtis shall not use any Carnival Information for its own use or for any purpose other than the specific purpose of completing the services under the MSA; (ii) DeCurtis shall not disclose any Carnival Information to any other person or entity; (iii) DeCurtis will hold the Carnival Information in strict confidence and

protect the confidential information from disclosure; and (iv) DeCurtis shall only reveal Carnival Information to DeCurtis employees on a need to know basis.

27.     In addition, the MSA expressly states that Carnival owns all work performed by DeCurtis under the MSA.  The MSA provides that all material prepared for Carnival under the MSA and related Statements of Work ("SOWs"), including trade secrets, inventions, business methods, programs, processes, discoveries, improvements, developments, designs, software programs, systems, specifications, documents or abstracts, or summaries thereof or any other material, and any derivative works thereof, shall remain the sole property of Carnival.  The MSA specifically prohibits DeCurtis' use of Carnival Information in connection with presentations to or work for other clients or prospective clients and permits use only of DeCurtis' "general knowledge and know how" in connection with any non-Carnival matter.

28.     The foregoing obligations remain in full force under the terms of the MSA, which is self-renewing and has never been terminated by either party.  Moreover, by its terms, the foregoing obligations survive even termination of the MSA.

29.     The MSA expressly acknowledges that breach of DeCurtis' confidentiality obligations may cause Carnival irreparable harm for which money is inadequate compensation, and that Carnival will be entitled to temporary and permanent injunctive relief to enforce its confidentiality rights, in addition to damages and other available remedies.

30.     The MSA also includes an audit provision that requires DeCurtis to keep accurate and complete records of all matters relevant to or as required by the MSA.  Carnival has continuing access to inspect those records at any reasonable time upon prior notice to ensure DeCurtis' compliance with the terms and conditions of the MSA.

31.     As provided for in the MSA, Carnival and DeCurtis entered into a series of SOWs defining in detail the services DeCurtis would provide for Carnival at various stages of the process and the work product and deliverables DeCurtis would create for Carnival.  The work product and deliverables included, among other things, prototypes; software; source code; architecture documents; technical specifications (e.g., data interface designs); databases; enterprise-ready web services; presentations; and documentation with respect to operations procedures, creative strategy, experience content, application support, deployment plans, and testing.  The documents and other information to which DeCurtis created for Carnival were Carnival's confidential and trade secret information.  Carnival had invested heavily in creating this information, as described above, and derived substantial economic value from this information, including by virtue of its secrecy.

32.     Carnival's work on rapid prototyping was intense and included working closely with DeCurtis for well over a year.  During this time period, as contemplated by the MSA, DeCurtis had access to substantially all of Carnival's extant confidential information, trade secrets, and other Carnival Information.

33.     DeCurtis personnel worked at Carnival's XIC and gained access to documents describing Carnival's vision, strategy, plans (e.g., strategy presentations), experience platform models, technical design documents, and list of strategic vendors.  Those materials included Carnival's proprietary plans for combining a wearable device containing Bluetooth Low Energy and Near Field Communications, mobile applications, and a digital engagement system, all functioning as a unified system on a multi-layer microservices platform technical architecture.  The materials Carnival provided to DeCurtis also included development schedules and team plans, early concepts for Carnival's wearable device, and Carnival's experience vision.  Carnival had invested heavily in

creating this information, as described above, and derived substantial economic value from this information, as described below.

34.     From the effective date of the MSA through at least the end of 2015, Carnival continued to provide confidential information and trade secrets to DeCurtis concerning Carnival's required hardware requirements; enterprise architecture; corporate abstraction layer of strategic services; interface layer designs, data models, database structures, and data interface designs and adapters; API dependencies; non-functional requirements; Carnival's particularized agile development methodology (timing and ordering of development sprints for different components); web service needs; show plans; user interface plans; design work; integration of technical components; testing plans; site surveys; functional plans; and studio shows.  Carnival had invested heavily in creating this information, as described above, and derived substantial economic value from this information, as described below.

35.     In 2016 and 2017, Carnival's focus on Project Trident gradually shifted from prototyping to implementing the solution on board cruise ships.  Ultimately, it took Carnival over 40 months to ready the Project Trident system for live testing, which commenced in November 2017.

**Carnival's Successful Introduction of the OCEAN® Platform**

36.     In January 2017, Carnival's CEO, Arnold Donald, made history as the first travel industry executive to deliver the opening keynote at CES, the world's largest consumer technology event.  He used his speech to announce the OCEAN® Platform – the world's first interactive guest experience platform capable of transforming vacation travel with a highly personalized and elevated level of customized service on a large scale.

37.     At the heart of Carnival's OCEAN® Platform is the OceanMedallion™ wearable, which is approximately the size of a quarter and weighs less than 2 ounces.  Each OceanMedallion™ is connected to a specific guest and interacts with thousands of sensors using Bluetooth Low Energy and Near Field Communication.

38.     The OCEAN® Platform was the result of Carnival's extensive work, investment, and ingenuity in Project Trident.  Carnival's OCEAN® Platform, enabled by the OceanMedallion™ wearable, facilitates payment, shipboard wayfinding, shipmate location services, personalized itineraries, expedited embarkation, and a wide range on-demand services.  For example, guests can place a food or drink order from anywhere on the ship, and the OceanMedallion™ directs crew members to their location.  The OceanMedallion™ also enables point-to-point wayfinding across the ship—like step-by-step directions to a restaurant or lounge—thanks to an intelligent navigation assistant.  The OceanMedallion™ also provides guests with touchless access to their state rooms—no key cards required.

39.     One of the key innovations of Carnival's OCEAN® Platform is its use of the aforementioned sensor network, Bluetooth Low Energy beacons, and mobile applications in order to create an end-to-end, holistically integrated guest engagement system.  Specifically, the OceanMedallion™ wearables themselves act as Bluetooth Low Energy beacons that uniquely identify the devices and their associated guests.  This feature is critical to enabling the functionalities described above.

40.     The OCEAN® Platform system debuted on a single cruise ship in November 2017.  At present, six cruise ships have been outfitted with OCEAN® Platform technology; these are known as MedallionClass™ ships.  Carnival plans to implement the OCEAN® Platform technology on at least six more cruise ships through the end of 2021.

41.     Accolades for the OCEAN® Platform have poured in.  IoT Breakthrough awarded Carnival the 2019 IoT Wearables Innovation of the Year for the OceanMedallion™, and one early reviewer described use of the OceanMedallion™ as "a magical experience that foretells the way that the internet of things ought to work."  FastCompany magazine named Carnival as one of the world's most innovative companies, citing the introduction of OceanMedallion™.  Press reports have described the OCEAN® Platform as a "game changer for the cruise industry."  Articles gushed that Carnival had "revolutionized" the guest experience with "super-smart tech."

42.     Furthermore, the OCEAN® Platform technology has been a source of additional revenue and profit for Carnival.

**Carnival's Patent Protection for Innovations from Project Trident**

43.     Carnival recognized that its Project Trident and OCEAN® Platform innovations included patentable inventions, and accordingly, Carnival applied for and obtained patent protection for this valuable intellectual property.

44.     Carnival filed provisional patent applications in the United States on November 11, 2016 and December 30, 2016.  Carnival filed a first United States utility application on March 15, 2017 claiming priority to these two provisional applications, and Carnival has since filed several other United States utility applications claiming priority to this utility application.  These utility applications have resulted in issued United States patents.  Carnival also filed an application under the international Patent Cooperation Treat (PCT) on May 17, 2017 claiming priority to the provisional applications and the first United States utility application.  Carnival has filed national stage patent applications in several countries and jurisdictions throughout the world based on the PCT application and has been issued patents already in some of these countries.

45.     In total, Carnival has nine granted patents (seven in the United States) and twenty-three pending patent applications in this patent family.  The granted patents in this family include the three patents asserted in this lawsuit:  United States Patent Numbers 10,045,184 (the "'184 Patent"); 10,049,516 (the "'516 Patent"); and 10,157,514 (the "'514 Patent").

46.     As taught in Carnival's patents, guests on cruise ships "have come to expect a high level of service and engagement," including "being provided with ready access to private and/or restricted areas" without having to proactively identify themselves and "being personally recognized by the hosts and provided with services and recommendations on that basis."  '184 Patent, Col. 1:20-31.

47.     Then-existing systems were limited in that "service and engagement [was] provided only on the basis of users providing a name or identification, tapping or swiping an access card, and having information on bookings retrieved manually by a host through a computer terminal," which felt "impersonal and disjointed."  '184 Patent, Col. 1:32-43.

48.     Carnival's patents describe and claim "a novel guest engagement system that relies on recent improvements in low power wireless communication technologies and distributed sensor networks to provide novel services to those guests without requiring guests to proactively identify and/or authenticate themselves. The guest engagement system thereby enables hosts to seamlessly engage with the guests throughout their facilities and provide recommendations to the guests based on the guests['] previous experiences."  '184 Patent, Col. 1:48-56.

49.     The patents describe systems that allow guests to have "individual guest devices" that are used to automatically identify and authenticate the guests throughout the facility to

seamlessly provide services. The guest devices (or medallions) periodically broadcast beacon signals that uniquely identify the devices and their associated guests.

50.     The periodic beacon signals are detected by sensors provided throughout the facility and used by the guest engagement system to provide personalized services.  More specifically, in one aspect, "a guest engagement system includes a plurality of guest devices provided to users of the guest engagement system, each guest device including a wireless communication antenna and operative to emit a periodic beacon signal broadcasting a unique identifier of the guest device using Bluetooth low energy (BLE) communications. The guest engagement system further includes a sensor network comprising a plurality of sensors each mounted at a different known location and operative to detect the periodic beacon signals including the unique identifiers emitted using BLE communications by guest devices of the plurality of guest devices that are proximate to the sensor." '184 Patent, Col. 1:66-2:27.

51.     The different patents and claims in Carnival's patent family claim different aspects of Carnival's inventions.  These include the construction and operation of the portable guest devices, the guest engagement system architecture, the interactions between portable guest devices and sensors, and functionalities made possible by the system such as automatic unlocking of doors, wayfinding, and payment services.

52.     These inventions—the result of Carnival's development project beginning in 2014 and described in Carnival's patent applications beginning in 2016—were later copied by DeCurtis.

**DeCurtis' Misappropriation of Carnival's Technology**

53.     According to a joint press release by Carnival competitor Norwegian Cruise Lines ("NCL") and DeCurtis, in May of 2018, NCL hired DeCurtis to develop a system that closely tracks

Carnival's OCEAN® Platform.  NCL calls its system "Cruise Freedom" and claims that DeCurtis is working with NCL to "leverage the latest in location-based technologies, including wearables, to meaningfully enhance the guest experience from the moment of booking and throughout their Norwegian cruise."  NCL has indicated that Cruise Freedom will "bring proximity and location [technology] to life" to facilitate *inter alia* embarkation and dining experiences.  In an investor conference call discussing Cruise Freedom, an NCL executive acknowledged "we're playing catch-up" to Carnival.  Within months of hiring DeCurtis, NCL was ready to begin live testing Cruise Freedom features on the Norwegian Bliss Cruise in late 2018.

54.     By no later than June 2018, DeCurtis separately began marketing a "new" Bluetooth Low Energy reader project.  In its marketing materials for this product, DeCurtis has passed off Carnival's inventions as its own.  For example, a page that first appeared on DeCurtis' website on or about June 2018 differentiates DeCurtis' product from existing stationary Bluetooth Low Energy beacons that push targeted advertisements to customers: "At DeCurtis, we rarely stop at the obvious. … We learned through our ground-breaking work in the cruise space around location and proximity that we needed to invert the traditional model. Beacons had, thus far, been the stationary object."

55.     DeCurtis "learned" to "invert the traditional model" from Carnival.  DeCurtis knew that its statements that "thus far" beacons had been stationary objects, and that DeCurtis "introduce[ed] the concept of a wearable" that contains a small beacon, were false.  Carnival conceived of these concepts long before and hired DeCurtis to help prototype them.  DeCurtis also knew that Carnival developed this technology to provide the same types of "transformational experiences" and location-based services that DeCurtis is now advertising.

56.     DeCurtis has marketed Carnival Information and Carnival's intellectual property as DeCurtis' own "solution to the cruise industry," and it has touted its ability to provide "Customized Experiences" that track closely with OCEAN® Platform functionality and with the descriptions in Carnival's patents.

57.     In publications, interviews, and marketing materials made public around the same time, DeCurtis bragged about how quickly it had developed its BLE solution and acknowledged that the solution was based on its prior work, i.e., DeCurtis' work for Carnival.  DeCurtis executive Derek Fournier has publicly stated that "going from concept to reality was remarkably quick. Leveraging years of previous experience and R&D in BLE projects made that possible."  The "experience" "leveraged" by DeCurtis was its work for Carnival including DeCurtis' access to and misuse of Carnival's confidential, proprietary, and trade secret information.  Another article stated that DeCurtis' development timeline for its BLE reader was "just six months."  DeCurtis' "remarkably quick" development timeline would not have been possible without DeCurtis' access to and misuse of Carnival's confidential, proprietary, and trade secret information.

58.     DeCurtis contacted many other third-party vendors with which Carnival had contracted to assist in the development of Project Trident seeking to work with those vendors to develop DeCurtis' competing solution.  DeCurtis knew that these vendors worked on Project Trident only through DeCurtis' access to Carnival's confidential information.

59.     Carnival sent correspondence to DeCurtis and NCL in January 2020 notifying DeCurtis and NCL of Carnival's patent portfolio covering aspects of the OCEAN® Platform technology.  Carnival further reminded DeCurtis of its confidentiality obligations to Carnival.

60.     In early February 2020, Carnival sent a letter to a new entrant to the cruise industry, Virgin Voyages ("Virgin"), notifying Virgin of Carnival's patent portfolio.  Just days later, Virgin

announced its intention to use a wearable device called "The Band" on its maiden cruise ship voyage.

61.     An industry article about the "The Band" noted that it "sounds incredibly similar" to Carnival's OceanMedallion™.  Indeed, Virgin is marketing many of the same material features as Carnival's OCEAN® Platform, such as granting cabin access, permitting ticketless boarding, making payments, pinpointing traveler location for beverage delivery, and facilitating onboard purchasing.

62.     Virgin began building its first cruise ship in or about early 2017, and at some point in 2017 or 2018, Virgin tasked DeCurtis with creating "The Band" and its associated systems on board the cruise ship.  The Band and its associated systems use technology sourced from DeCurtis.

63.     The same DeCurtis employees who worked on Project Trident have also worked on NCL's Cruise Freedom system and Virgin Voyages "The Band" system.  At all times relevant, these DeCurtis employees had access to Carnival's written materials in DeCurtis' possession.

**DeCurtis' Breaches of Audit Requirements of the MSA to Conceal its Misconduct**

64.     The announcement of "The Band" heightened Carnival's concern DeCurtis may have disclosed or misused Carnival confidential information, proprietary information, and trade secrets to Virgin and/or NCL.  Accordingly, Carnival sent DeCurtis a letter exercising its audit rights under the MSA.  Carnival sought to audit DeCurtis' documents, source code, and records related to DeCurtis' work under the MSA, as well as records showing all measures DeCurtis has taken, if any, to ensure the confidentiality of Carnival's confidential information.  Carnival asked that DeCurtis respond by February 24, 2020 providing a date certain, by no later than March 2, 2020, when Carnival could begin the audit along with necessary logistical information.

65.     By letter dated February 24, 2020, DeCurtis refused Carnival's audit demand in breach of the MSA.  DeCurtis' February 24 letter stated that it was denying Carnival's audit demand because, *inter alia*, "DeCurtis must maintain the confidentiality of information from third parties whose information you have requested."  Yet Carnival requested no third-party information in its audit demand.

66.     DeCurtis' February 24 letter admits that an audit of DeCurtis' Carnival work product and Carnival confidential information in DeCurtis' possession would require disclosure of work that DeCurtis performed for third-parties.  This admission confirmed Carnival's fears that DeCurtis used work product it had prepared for Carnival and Carnival's confidential information to rapidly create competing technology, a breach of the MSA and a misappropriation of Carnival's trade secrets.

67.     Notwithstanding Carnival's continued, repeated demands to conduct an audit of DeCurtis' records relating to its work under the MSA, DeCurtis has refused to permit such an audit or otherwise to permit Carnival to ascertain the extent of DeCurtis failure of compliance with the terms and conditions of the MSA.

68.     NCL's and Virgin's accelerated development time for their respective wearable devices and related systems is the result of DeCurtis' breaches of the MSA, misappropriation, disclosure and use of Carnival information and trade secrets, and patent infringement.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

69.     Carnival hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

70.     Carnival and DeCurtis are parties to a valid, existing contract: the MSA.

71.     Carnival has performed its obligations under the MSA.

72.     DeCurtis has breached its obligations under the MSA by making unauthorized disclosures and/or use of Carnival's confidential information, by making unauthorized disclosures and/or use of work product and deliverables produced for Carnival under the MSA and which are Carnival's property, and by refusing to comply with Carnival's audit demands.

73.     DeCurtis' breaches have proximately caused Carnival foreseeable monetary harm in an amount to be proven at trial.

74.     DeCurtis' breaches have proximately caused Carnival irreparable injury that can only be remedied by an order of specific performance and injunctive relief.

**SECOND CLAIM FOR RELIEF**
**(Violations of the Defend Trade Secrets Act, 18 U.S.C. § 1832 *et seq.*)**

75.     Carnival hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

76.     Project Trident information that Carnival provided to DeCurtis includes financial, business, scientific, technical, economic, and engineering information.

77.     At all times relevant, Carnival has taken reasonable measures to keep Project Trident information secret.  Among other measures, Carnival maintains Project Trident information in password-secured repositories and maintains robust physical security to its facilities, including the XIC, to ensure that unauthorized persons cannot gain unauthorized access.  Carnival only permits persons to access Project Trident on a need to know basis, and only to persons who have agreed to maintain the secrecy of such information.

78.     Carnival's Project Trident information derives actual and potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, third parties.

79.     Without Carnival's consent, DeCurtis disclosed to NCL and/or Virgin, and/or used on their behalf, Carnival's Project Trident trade secret information.  DeCurtis was aware that Carnival's Project Trident information comprised trade secrets, and that it was improper for DeCurtis to disclose and/or use Carnival's trade secrets in the manner alleged.

80.     DeCurtis' unauthorized disclosure and/or use of Carnival's trade secret information has proximately harmed Carnival and caused monetary loss in an amount to be determined at trial.

81.     DeCurtis' unauthorized disclosure and/or use of Carnival's trade secret information has proximately caused Carnival irreparable harm that can only be remedied by injunctive relief.

82.     DeCurtis' conduct was willful and carried out with conscious disregard for Carnival's rights.

83.     Carnival is entitled to damages, attorneys fees, and injunctive relief on account of DeCurtis' violation of the Defend Trade Secrets Act.

**THIRD CLAIM FOR RELIEF**
**(Violations of the Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.001 *et seq.*)**

84.     Carnival hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

85.     DeCurtis' conduct violates the Florida Uniform Trade Secrets Act.

86.     DeCurtis' unauthorized disclosure and/or use of Carnival's trade secret information has proximately harmed Carnival and caused monetary loss in an amount to be determined at trial.

87.     DeCurtis' unauthorized disclosure and/or use of Carnival's trade secret information has proximately caused Carnival irreparable harm that can only be remedied by injunctive relief.

88.     DeCurtis' conduct was willful and carried out with conscious disregard for Carnival's rights.

89.     Carnival is entitled to damages, attorneys fees, and injunctive relief on account of DeCurtis' violation of the Florida Uniform Trade Secrets Act.

## FOURTH CLAIM FOR RELIEF
### (Infringement of United State Patent No. 10,045,184)

90.     Carnival hereby restates and re-alleges the allegations set forth above and incorporates them by reference.

91.     On August 7, 2018, the '184 Patent, titled "Wireless Guest Engagement System," was duly issued to inventors John Padgett, Michael G. Jungen, Douglas Steele, Kyle Prestenback, Richard J. Criado, Vince Ball, Adam Leonards, Glenn Curtis, Manny Vellon, Patrick Mendiuk, Sander Lam and assignee plaintiff Carnival Corporation by the United States Patent and Trademark Office.  A copy of the '184 Patent is attached to this Complaint as Exhibit A.

92.     At all times since the date of issue of the '184 Patent, Carnival has been, and currently is, the exclusive owner of the entire right, title and interest in and to the '184 Patent.

93.     Carnival's ownership of the '184 Patent includes, without limitation, the exclusive right to enforce the '184 Patent, the exclusive right to file actions based on infringement of the '184 Patent, the exclusive right to recover damages or other monetary amounts for infringement of the '184 Patent and the exclusive right to be awarded injunctive relief pertaining to the '184 Patent.

94.     The '184 Patent claims systems which provide seamless engagement with guests of facilities through the use of wireless sensing technologies.

95.     For example, claim 11 of the '184 Patent recites:

A guest engagement system comprising: a plurality of portable guest devices provided to users of the guest engagement system to be carried by the users, each guest device having a

unique identifier and including first and second wireless communication antennas respectively configured for Bluetooth low energy (BLE) and near field communication (NFC) communications;

a sensor network comprising a plurality of sensors each mounted at a different location, wherein at least one sensor of the plurality of sensors is operative to detect portable guest devices that are proximate thereto and receive unique identifiers therefrom based on BLE communication with the portable guest devices and at least another sensor of the plurality of sensors is operative to detect portable guest devices that are proximate thereto and receive unique identifiers therefrom based on NFC communication with the portable guest devices;

a communication network connecting each of the plurality of sensors of the sensor network; and

a central server communicatively connected to each of the plurality of sensors of the sensor network via the communication network, and storing a log associating each unique identifier of a portable guest device received using BLE or NFC communications by a sensor of the sensor network,

wherein each guest device is configured to selectively operate according to first and second operating modes, each guest device engaging in bi-directional communication using the first wireless communication antenna configured for BLE communications in the first operating mode and engaging in a beacon mode periodically broadcasting a beacon signal using the first wireless communication antenna configured for BLE communications in the second operating mode, and each sensor of the sensor network is operative to transmit a command to a guest device in its communication range to cause the guest device to change operating mode between the first and second operating modes.

96.     DeCurtis' customers Virgin and NCL use guest engagement systems that directly infringe at least claims 11, 12 (relating to sensors with two-way communications); 13 (related to encrypted communications); 14 (relating to door lock access panels); and 15 (relating to periodic beacon signals) of the '184 Patent.  Systems of DeCurtis' customers further directly infringe independent claim 1 and its dependent claims 2 and 3, independent claim 7 and its dependent claims 8, 9, and 10, and independent claim 19 and its dependent claim 20.  Discovery may reveal further evidence that additional claims of the '184 Patent are directly infringed by DeCurtis' customers.

97.     An exemplary explanation of how DeCurtis' customers infringe these claims is set forth below.  The relevant and cited portions of the public domain documents referenced below describe the functionality of DeCurtis' customers' Accused Systems.

98.     Virgin Voyages is using a guest engagement system that includes "the Band." "The Band," is a portable guest device provided by Virgin to users to be carried by the users. *See* https://www.virginvoyages.com/press/latest-releases/smart-cruise-wearable ("Introducing The Band – Virgin Voyages' Smart Wearable Technology Made with Ocean Plastic")

99.     Each Band device has a unique identifier.  Each Band device has a unique Bluetooth Low Energy ("BLE") identifier.  *See* Figure 3 below.  When the data obtained via packet capture shown in Figure 3 is decoded, a UUID (Universally Unique Identifier), Major, and Minor values are obtained, which are unique identifiers.  In documentation describing its BLE system, DeCurtis has described the "Beacon" as "[a] combination of identifying (UUID, major, minor, mac address, etc.) and location metadata (geom field, point) representing a single Beacon. The design assumption is that the (UUID, major, minor, mac address) will be unique to a single device."  The Band also has unique identifiers associated with NFC communications,

including a UUID and a serial number.  *See* Figure 4 below.  These BLE and NFC identifiers are received by sensors onboard the Virgin cruise ship (discussed further below) which detect Band devices proximate to the sensors.

100.    The Band includes a first and second wireless antenna as shown in Figure 1 below.  The Band's antennas are respectively configured for Bluetooth low energy (BLE) and near field communication (NFC).

*Figure 1*



101.    Virgin's cruise ship includes a sensor network with a plurality of sensors mounted at different locations.  The Band is used by guests to "[a]ccess their cabins, serving as a room key," "[p]inpoint location for delivery" of services (e.g., champagne delivery), "[m]ake onboard purchases," "[g]ame at the casino," and as a "VIP pass."  *See* https://www.virginvoyages.com/press/latest-releases/smart-cruise-wearable.   Each of these functionalities uses sensors that are part of a sensor network; e.g., a sensor is used to detect and

communicate with the Band devices to unlock a guest's room door, and sensors are used to detect and communicate with a Band device to pinpoint that device's location.

102.    The Band communicates with at least one sensor operative to detect portable guest devices that are proximate thereto and receive unique identifiers therefrom based on BLE communication. *Inter alia*, the Band communicates two different types of BLE "advertisements" and NFC data, each of which provides location-based information and services.  The BLE data communicated by the Band and received by the sensors includes a unique identifier, as does the NFC data communicated by the Band, as described above.

103.    Figure 2 below a depicts BLE packet capture for advertisements communicated by the Band in mode with a Protocol Data Unit ("PDU") type of "ADV_IND."  This is a mode in which the BLE device requests connection to a central device.

*Figure 2*



| No. | Time | Source | | Destination | Protocol | Length | Opcode | Info |
|---|---|---|---|---|---|---|---|---|
| 10… | 104.259813 | 3e:7a:df:1e:2e:f9 | | Broadcast | LE LL | 63 | | ADV_IND |
| 10… | 104.259813 | 3e:7a:df:1e:2e:f9 | | Broadcast | LE LL | 63 | | ADV_IND |
| 10… | 104.259813 | 3e:7a:df:1e:2e:f9 | | Broadcast | LE LL | 63 | | ADV_IND |

```
> Frame 10994: 63 bytes on wire (504 bits), 63 bytes captured (504 bits) on interface 0
> Nordic BLE Sniffer
∨ Bluetooth Low Energy Link Layer
     Access Address: 0x8e89bed6
   ∨ Packet Header: 0x2560 (PDU Type: ADV_IND, ChSel: #2, TxAdd: Random)
         .... 0000 = PDU Type: ADV_IND (0x0)
         ...0 .... = RFU: 0
         ..1. .... = Channel Selection Algorithm: #2
         .1.. .... = Tx Address: Random
         0... .... = Reserved: False
         Length: 37
     <Length: 37>
     Advertising Address: 3e:7a:df:1e:2e:f9 (3e:7a:df:1e:2e:f9)
```

104.    Figure 3 below depicts a BLE packet capture for advertisements communicated by the Band in a mode with a PDU type of "ADV_NONCONN_INFO."  This is a mode in which the BLE device broadcasts a non-connectible beacon advertisement.

*Figure 3*



105.    The Band devices include hardware and/or software supplied by DeCurtis for at least BLE communications.  The sensors on the Virgin ship include hardware and/or software supplied by DeCurtis operative to detect The Band devices proximate to the sensors and receive unique identifiers from The Band devices based on at least BLE communication.  For example,

DeCurtis has advertised that its "Bluetooth Low Energy Module" "can read hundreds of beacons per second providing specific location, not just relative proximity information, which allows businesses to improve the customer experience in various ways." *See* https://decurtis.com/2018/10/21/introducing-our-bluetooth-low-energy-module/.  This sensor functionality is provided by DeCurtis as hardware modules that plug into wireless access points or as software that integrates with wireless access points or other wireless communication devices on the Virgin ship.

106.    Figure 4 below depicts an NFC packet capture for communications by the Band.

*Figure 4*



107.    Virgin Voyages ships include a communication network, such as a Wi-Fi network, connecting a plurality of sensors, as explained further above.

108.    The system relies on a central server to connect the sensor network, and this
server logs information associating unique device identifiers received by the sensors with other
data, such as device location, for example.  *See, e.g.,* https://www.seatrade-
cruise.com/news/virgin-voyages-introduces-its-wearable-technology-band ("Activated with a tap
of the wrist, it also pinpoints location for delivery of Shake for Champagne, enables gaming in
the casino and serves as a VIP pass for suite sailors to enter Richard's Rooftop.")  DeCurtis has
explained that the hardware and/or software it provides for the sensors processes information
received from BLE beacons (here, the Band devices) and forwards that information to a central
location services platform to track the location of the devices and provide navigation and
wayfinding.  *See* https://decurtis.com/decurtis-experience-platform/location-proximity/

109.    The Band is configured to selectively operate according to first and second
operating modes.  Because the Band device has one BLE antenna, the Band device cannot
transmit different types of BLE communications simultaneously.  In one operating mode, the
Band transmits periodic beacon advertisements on fixed intervals to any listening device.   This
is discussed above with respect to Figures 2 and 3.  DeCurtis provided hardware and/or software
in the Band devices that causes the devices to operate in beacon mode.  *See*
https://decurtis.com/decurtis-experience-platform/location-proximity/ ("We have flipped the
traditional model of placing beacons in rooms, we give that power to the guests in the form of a
wearable and put the BLE readers on the walls of an indoor space.")  As explained above, when
broadcasting in the "ADV_IND" mode, the Band is requesting a connection from a central
device.  This mode is used to establish bi-directional communication between devices.  When the
Band receives a bi-directional communication from a sensor, the Band changes to a second
operating mode.  In this second operating mode, the Band stops its fixed interval beacon

transmissions while it engages in bi-directional communication with sensors.  This occurs, for example, when the Band communicates with sensors to "act as a room key" and open a guest's cabin.

110.    DeCurtis' customers directly infringe the '184 Patent at least when they make and use the guest engagement systems that practice the claims of the '184 Patent, for example as described above (hereafter, the "'184 Infringing Systems").

111.    DeCurtis contributes to its customers' direct infringement of the '184 Patent, including by providing discrete, material components of the '184 Infringing Systems to its customers for installation or replacement.  Components of the '184 Infringing Systems provided by DeCurtis to its customers include hardware and/or software in the sensors described above, hardware and/or software comprising the central server describe above, and hardware and/or software comprising the portable guest devices described above.  Said components have been especially made or especially adapted by DeCurtis for use in infringement of the '184 Patent. Said components are not suitable for any substantial noninfringing use.

112.    DeCurtis has actively induced and is actively inducing its customers to make and use the '184 Infringing Systems in a manner that directly infringes the '184 Patent.  DeCurtis has taken and is taking active steps, directly and/or through contractual relationships with its customers and others, with the specific intent to cause its customers to make and use the '184 Infringing Systems in a manner that infringes one or more claims of the '184 Patent. For example, DeCurtis has provided and provides documentation and other instructional and training materials, instructing customers on how to make and use the '184 Infringing Systems, including making and using infringing features and functionalities of the '184 Infringing Systems. DeCurtis also has provided and provides marketing materials that include information on the

'184 Infringing Systems and infringing features of the '184 Infringing Systems, in an effort to induce customers and potential customers into purchasing, making, and using the '184 Infringing Systems in an infringing manner.  DeCurtis provides ongoing technical and other customer support to its customers to ensure that its customers continue to make and use the '184 Infringing Systems.  DeCurtis intends for customers to use the '184 Infringing Systems to commit acts of direct infringement.

113.    DeCurtis has had knowledge of the '184 Patent since no later than January 29, 2020, when counsel for Carnival specifically notified DeCurtis of the '184 Patent.  Even before that date, DeCurtis had actual knowledge of the '184 Patent or at minimum willfully blinded itself to the existence of the '184 Patent and DeCurtis' infringement.  DeCurtis had deep knowledge of Carnival's development of the OCEAN® Platform through its work as Carnival's contractor, and DeCurtis knew that Carnival owned the intellectual property in the OCEAN® Platform.  DeCurtis could not have embarked upon and continued developing competing products using Carnival's confidential information, as described above, without at minimum being willfully blind as to the existence of Carnival's patent rights (including the '184 Patent). DeCurtis' behavior was and continues to be reckless, egregious, wanton, bad-faith, malicious, and characteristic of a pirate.  DeCurtis has had knowledge that the products and components it has sold and is selling to its customers, as described above, are especially made or especially adapted for use in an infringement of the '184 Patent.  DeCurtis knew that the activities of its customers that it induced, as described above, would amount to infringement of the '184 Patent. DeCurtis' infringement of the '184 Patent is and has been willful.

114.    Due to DeCurtis' infringement, Carnival has suffered, is suffering, and will continue to suffer irreparable injury for which Carnival has no adequate remedy at law, including

loss of market share and customer goodwill. Carnival is therefore entitled to a permanent injunction against DeCurtis' further infringement.

115.    Carnival has been and is being damaged due to DeCurtis' infringement. Carnival is therefore entitled to recover all damages from DeCurtis and the total profits lost, or, at minimum, a reasonable royalty, all in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Infringement of United State Patent No. 10,049,516)

116.    Carnival hereby restates and re-alleges the allegations set forth above and incorporates them by reference

117.    On August 7, 2018, the '516 Patent, titled "Door Locks and Assemblies for Use in Wireless Guest Engagement Systems," was duly issued to inventors John Padgett, Michael G. Jungen, Douglas Steele, Kyle Prestenback, Richard J. Criado, Vince Ball, Adam Leonards, Glenn Curtis, Manny Vellon, Patrick Mendiuk, Sander Lam and assignee plaintiff Carnival Corporation by the United States Patent and Trademark Office. A copy of the '516 Patent is attached to this Complaint as Exhibit B.

118.    At all times since the date of issue of the '516 Patent, Carnival has been, and currently is, the exclusive owner of the entire right, title and interest in and to the '516 Patent.

119.    Carnival's ownership of the '516 Patent includes, without limitation, the exclusive right to enforce the '516 Patent, the exclusive right to file actions based on infringement of the '516 Patent, the exclusive right to recover damages or other monetary amounts for infringement of the '516 Patent and the exclusive right to be awarded injunctive relief pertaining to the '516 Patent.

120.    The '516 Patent claims systems which provide seamless engagement with guests of facilities through the use of wireless sensing technologies.

121.   For example, claim 13 of the '516 Patent recites an electronic door lock assembly comprising:

a latch assembly with an electronically controlled locking mechanism;

a door lock communication module, including a radio configured for wireless communication;

an access panel separate from and fixedly mounted proximate to the door lock communication module and latch assembly including a first transceiver configured for wireless communication with a portable user device, and a second transceiver for communication with a reservation server;

wherein the access panel is configured to receive door access information from the reservation server via the second transceiver, determine whether the door should be unlocked, and transmit an instruction to unlock the door to the door lock communication module.

122.   DeCurtis' customers directly infringe at least claim 13 of the '516 Patent and its dependent claims 15 and 18, at least when they make and use the guest engagement systems that practice the claims of the '516 Patent.  Discovery may reveal further evidence that additional claims of the '516 Patent are directly infringed by DeCurtis' customers.

123.   The Virgin cruise ship designed to work with the Band and implement DeCurtis's technology includes a latch assembly with an electronically controlled locking mechanism, a door lock communication module, including a radio configured for wireless communication, and an access panel separate from and fixedly mounted proximate to the door lock communication module and latch assembly.  These are shown below.

*Figure 5*



124.     The access panel includes a first transceiver configured for wireless communication with a portable user device.  As described above with respect to Figure 2, the Band devices broadcast BLE communications with a PDU type of "ADV _INFO," an advertisement designed to establish a bidirectional communication, here with a BLE sensor in the access panel that uses hardware and/or software provided by DeCurtis.  Information obtained from capture of Bluetooth packets from a Band device indicates that these advertisements are used to establish bi-directional communications with a sensor used in a door access panel for unlocking a cabin door.

125.     The access panel includes a second transceiver for communication with a reservation server, is configured to receive door access information from the reservation server via the second transceiver, determine whether the door should be unlocked, and transmit an instruction to unlock the door to the door lock communication module.  The Band and the BLE sensor in the access panel establish a secure bidirectional communications channel.  After

receiving identifying information from the Band, hardware and software within the access panel determine whether the door should be unlocked based on that information and door access information received from a reservation server, and then when appropriate transmit an instruction to unlock the door to the door lock communication module.

126.     DeCurtis contributes to its customers' direct infringement of the '516 Patent, including by providing discrete, material components of the '516 Infringing Systems to its customers for installation or replacement.  Components of the '516 Infringing Systems provided by DeCurtis to its customers include hardware and/or software in the access panel and reservation server described above.  Said components have been especially made or especially adapted by DeCurtis for use in infringement of the '516 Patent.  Said components are not suitable for any substantial noninfringing use.

127.     DeCurtis has actively induced and is actively inducing its customers to make and use the '516 Infringing Systems in a manner that directly infringes the '516 Patent.  DeCurtis has taken and is taking active steps, directly and/or through contractual relationships with its customers and others, with the specific intent to cause its customers to make and use the '516 Infringing Systems in a manner that infringes one or more claims of the '516 Patent. For example, DeCurtis has provided and provides documentation and other instructional and training materials, instructing customers on how to make and use the '516 Infringing Systems, including making and using infringing features and functionalities of the '516 Infringing Systems. DeCurtis also has provided and provides marketing materials that include information on the '516 Infringing Systems and infringing features of the '516 Infringing Systems, in an effort to induce customers and potential customers into purchasing, making, and using the '516 Infringing Systems in an infringing manner.  DeCurtis provides ongoing technical and other customer

support to its customers to ensure that its customers continue to make and use the '516 Infringing Systems. DeCurtis intends for customers to use the '516 Infringing Systems to commit acts of direct infringement.

128. DeCurtis has had knowledge of the '516 Patent since no later than January 29, 2020, when counsel for Carnival specifically notified DeCurtis of the '516 Patent. Even before that date, DeCurtis had actual knowledge of the '516 Patent or at minimum willfully blinded itself to the existence of the '516 Patent and DeCurtis' infringement. DeCurtis had deep knowledge of Carnival's development of the OCEAN® Platform through its work as Carnival's contractor, and DeCurtis knew the Carnival owned the intellectual property in the OCEAN® Platform. DeCurtis could not have embarked upon and continued developing competing products using Carnival's confidential information, as described above, without at minimum being willfully blind as to the existence of Carnival's patent rights (including the '516 Patent). DeCurtis' behavior was and continues to be reckless, egregious, wanton, bad-faith, malicious, and characteristic of a pirate. DeCurtis has had knowledge that the products and components it has sold and is selling to its customers, as described above, are especially made or especially adapted for use in an infringement of the '516 Patent. DeCurtis knew that the activities of its customers that it induced, as described above, would amount to infringement of the '516 Patent. DeCurtis' infringement of the '516 Patent is and has been willful.

129. Due to DeCurtis' infringement, Carnival has suffered, is suffering, and will continue to suffer irreparable injury for which Carnival has no adequate remedy at law, including loss of market share and customer goodwill. Carnival is therefore entitled to a permanent injunction against DeCurtis' further infringement.

130.    Carnival has been and is being damaged due to DeCurtis' infringement.  Carnival is therefore entitled to recover all damages from DeCurtis and the total profits lost, or, at minimum, a reasonable royalty, all in an amount to be proven at trial.

### SIXTH CLAIM FOR RELIEF
### (Infringement of United State Patent No. 10,157,514)

131.    Carnival hereby restates and re-alleges the allegations set forth above and incorporates them by reference

132.    On August 7, 2018, the '514 Patent, titled "Portable Wearable Devices for Use in Wireless Guest Engagement Systems," was duly issued to inventors John Padgett, Michael G. Jungen, Douglas Steele, Kyle Prestenback, Richard J. Criado, Vince Ball, Adam Leonards, Glenn Curtis, Manny Vellon, Patrick Mendiuk, Sander Lam and assignee plaintiff Carnival Corporation by the United States Patent and Trademark Office.  A copy of the '184 Patent is attached to this Complaint as Exhibit C.

133.    At all times since the date of issue of the '514 Patent, Carnival has been, and currently is, the exclusive owner of the entire right, title and interest in and to the '514 Patent.

134.    Carnival's ownership of the '514 Patent includes, without limitation, the exclusive right to enforce the '514 Patent, the exclusive right to file actions based on infringement of the '514 Patent, the exclusive right to recover damages or other monetary amounts for infringement of the '514 Patent and the exclusive right to be awarded injunctive relief pertaining to the '514 Patent.

135.    The '514 Patent claims systems which provide seamless engagement with guests of facilities through the use of wireless sensing technologies.

136.    For example, claim 11 of the '514 Patent recites a portable wireless device comprising:

a body having a fully enclosed cavity, the body having all dimensions equal to or smaller than 2.5 inches, and the body having a thickness equal to or smaller than ⅝ inch;

a processor, a memory, a battery, and first and second wireless communication antennas disposed in the cavity;

wherein the first and second wireless communication antennas are respectively configured for BLE and NFC communications;

the processor is configured to establish secure communication links with remote communication devices using the first wireless communication antenna configured for BLE communications;

the memory stores both public and private identifiers unique to the portable wireless device;

the processor controls the first wireless communication antenna to emit a periodic beacon signal broadcasting the unique public identifier of the portable wireless device using BLE communications, and

the processor controls the first wireless communication antenna to transmit the private identifier only across secure communication links established with remote communication devices using BLE communications.

137.     DeCurtis' customers directly infringe at least claim 11 of the '514 Patent at least when they make and use the guest engagement systems that practice the claims of the '514 Patent, for example as described above with respect to DeCurtis' customers' wearable devices. Discovery may reveal further evidence that additional claims of the '514 Patent are directly infringed by DeCurtis' customers.

138.    For example, the Band is a portable wireless device with a body having a fully enclosed cavity, the body having all dimensions equal to or smaller than 2.5 inches, and the body having a thickness equal to or smaller than ⅝ inch, as depicted in Figure 6 below.  The thickness of the Band's body is approximately ¼ of an inch.

*Figure 6*



139.    In addition, the Band includes a processor, a memory, a battery, and first and second wireless communication antennas disposed in the cavity, wherein the first and second wireless communication antennas are respectively configured for BLE and NFC communications, as depicted in Figure 1 above.

140.    The processor in the Band is configured to establish secure communication links with remote communication devices using the first wireless communication antenna configured for BLE communications, the Band's memory stores a private identifier unique to the portable

wireless device, and the Band's processor transmits the private identifier only across secure communication links established with remote communication devices using BLE communications.  As explained above, the Band, for example, establishes a bi-directional communication link with a remote communication device located in the access panel for a guest's cabin and transmits unique identifying information to the access panel.  This transmission is done over a secure communication link and uses a private identifier transmitted only over the secure communications link to ensure security and prevent unauthorized room entry.

141.    The Band's memory stores a public identifier unique to the portable wireless device, and the Band's processor controls the first wireless communication antenna to emit a periodic beacon signal broadcasting the unique public identifier of the portable wireless device using BLE communication.  This is described above with respect to Figure 3.

142.    DeCurtis contributes to its customers' direct infringement of the '514 Patent, including by providing discrete, material components of the '514 Infringing Systems to its customers for installation or replacement.  Components of the '514 Infringing Systems provided by DeCurtis to its customers include hardware and/or software in the sensors described above, and hardware and/or software comprising the portable guest devices described above.  Said components have been especially made or especially adapted by DeCurtis for use in infringement of the '514 Patent.  Said components are not suitable for any substantial noninfringing use.

143.    DeCurtis has actively induced and is actively inducing its customers to make and use the '514 Infringing Systems in a manner that directly infringes the '514 Patent.  DeCurtis has taken and is taking active steps, directly and/or through contractual relationships with its customers and others, with the specific intent to cause its customers to make and use the '514

Infringing Systems in a manner that infringes one or more claims of the '514 Patent. For example, DeCurtis has provided and provides documentation and other instructional and training materials, instructing customers on how to make and use the '514 Infringing Systems, including making and using infringing features and functionalities of the '514 Infringing Systems. DeCurtis also has provided and provides marketing materials that include information on the '514 Infringing Systems and infringing features of the '514 Infringing Systems, in an effort to induce customers and potential customers into purchasing, making, and using the '514 Infringing Systems in an infringing manner.  DeCurtis provides ongoing technical and other customer support to its customers to ensure that its customers continue to make and use the '514 Infringing Systems.  DeCurtis intends for customers to use the '514 Infringing Systems to commit acts of direct infringement.

144.    DeCurtis has had knowledge of the '514 Patent since no later than January 29, 2020, when counsel for Carnival specifically notified DeCurtis of the '514 Patent.  Even before that date, DeCurtis had actual knowledge of the '514 Patent or at minimum willfully blinded itself to the existence of the '514 Patent and DeCurtis' infringement.  DeCurtis had deep knowledge of Carnival's development of the OCEAN® Platform through its work as Carnival's contractor, and DeCurtis knew the Carnival owned the intellectual property in the OCEAN® Platform.  DeCurtis could not have embarked upon and continued developing competing products using Carnival's confidential information, as described above, without at minimum being willfully blind as to the existence of Carnival's patent rights (including the '514 Patent). DeCurtis' behavior was and continues to be reckless, egregious, wanton, bad-faith, malicious, and characteristic of a pirate.  DeCurtis has had knowledge that the products and components it has sold and is selling to its customers, as described above, are especially made or especially

adapted for use in an infringement of the '514 Patent.  DeCurtis knew that the activities of its customers that it induced, as described above, would amount to infringement of the '514 Patent. DeCurtis' infringement of the '514 Patent is and has been willful.

145.    Due to DeCurtis' infringement, Carnival has suffered, is suffering, and will continue to suffer irreparable injury for which Carnival has no adequate remedy at law, including loss of market share and customer goodwill.  Carnival is therefore entitled to a permanent injunction against DeCurtis' further infringement.

146.    Carnival has been and is being damaged due to DeCurtis' infringement.  Carnival is therefore entitled to recover all damages from DeCurtis and the total profits lost, or, at minimum, a reasonable royalty, all in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Carnival prays for judgment against DeCurtis as follows:

A.      Entry of judgment in favor of Carnival against DeCurtis on all counts;

B.      A judgment and order awarding Carnival damages caused by DeCurtis' breach of contract and misappropriation of trade secrets;

C.      A judgment and order requiring DeCurtis to pay Carnival all damages caused by DeCurtis' infringement of the '184 Patent, the '514 Patent, and the '516 Patent (but in no event less than a reasonable royalty) pursuant to 35 U.S.C. § 284;

D.      A judgment and order requiring DeCurtis to pay Carnival pre-judgment and post-judgment interest on any damages or profits awarded;

E.      A judgment and order requiring DeCurtis to pay Carnival increased damages up to three times the amount found or assessed pursuant to 35 U.S.C. § 284;

F.      A judgment and order awarding Carnival its costs and attorneys' fees;

G.      An order for an accounting of all gains, profits, cost savings and advantages realized by DeCurtis from its breach of contract and misappropriation of trade secrets;

H.      An order requiring DeCurtis to comply with the MSA, including the MSA's audit provisions;

I.      An order preliminarily and permanently enjoining DeCurtis, its officers, agents, servants, employees, attorneys, affiliated companies, assigns and successors in interest, and all persons and entities acting in concert with them, from misappropriating Carnival's trade secrets;

J.      An order preliminarily and permanently enjoining DeCurtis, its officers, agents, servants, employees, attorneys, affiliated companies, assigns and successors in interest, and all persons and entities acting in concert with them, from breaching the parties agreement;

K.      An order and judgment preliminarily and permanently enjoining DeCurtis its officers, agents, servants, employees, attorneys, affiliated companies, assigns and successors in interest,  and all persons and entities acting in concert with them, from infringing the '184 Patent, the '514 Patent, and the '516 Patent;

L.      A determination that this action is an exceptional case pursuant to 35 U.S.C. § 285; and

M.      All such further and additional relief, in law or equity, to which Carnival may be entitled or which the Court deems just and proper.

Dated:  April 10, 2020

By: /s/ *Diana Szego Fassbender*
    Diana Szego Fassbender
    Florida Bar No. 0017095
    dszego@orrick.com
    Steven J. Routh (*pro hac vice* pending)
    T. Vann Pearce, Jr. (*pro hac vice* pending)
    ORRICK, HERRINGTON & SUTCLIFFE LLP
    Columbia Center, 1152 15th Street, N.W.,
    Washington, D.C. 20005-1706
    Tel:  202/339-8533

    Robert L. Uriarte (*pro hac vice* pending)
    ORRICK, HERRINGTON & SUTCLIFFE LLP
    1000 Marsh Road
    Menlo Park, CA 94025
    Tel: (650) 289-7105

    Attorneys for Plaintiff,
    CARNIVAL CORPORATION